DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Frank.Riebli@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 15-579 VC |
| Plaintiff, | |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY PURSUANT TO 18 U.S.C. § 3582 |
| VALENTIN CAMACHO TOLEDO, | |
| Defendant. | |

## I. INTRODUCTION

Valentin CAMACHO Toledo is currently serving a 121-month sentence for his part in a drug trafficking conspiracy. CAMACHO seeks release from custody on the ground that he is obese and has hypertension, and that this puts him at greater risk of serious illness if he contracts COVID-19 while in custody. CAMACHO's medical records confirm that he is obese and show that he might have high blood pressure. But the facility where he is housed has had only 20 coronavirus cases in total, and has zero cases now. Releasing CAMACHO after less than five years of his 10-year sentence would be inappropriate. As the Court will recall, he was one of the persons who supplied methamphetamine to Eutimio Reyna Ceron, and thus fueled Reyna Ceron's drug distribution network. Agents recovered 10 pounds of meth in the crawlspace under CAMACHO's house. CAMACHO already received the lowest sentence of any of the defendants at his level of the criminal scheme. Cutting that sentence in half would create unwarranted sentencing disparities and result in a sentence that fails to reflect the seriousness of his offense. CAMACHO offers to agree to deportation and return to Mexico, perhaps as a way to mitigate the risk that he might otherwise pose to the community. But he has already been deported at least once and returned to the United States illegally. It is not a stretch to imagine him doing it again, especially when he has family that live in the Santa Rosa area. For all of these reasons, the government recommends that the Court deny his motion.

## II. BACKGROUND

The grand jury charged CAMACHO with conspiring with others, including Reyna Ceron, to distribute and possess with intent to distribute 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A). It also charged him with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). He was arrested on December 10, 2015 and detained pending trial.

As the Court will recall, Eutimio Reyna Ceron ran a retail drug distribution operation in Santa Rosa, California. Pre-Sentence Report ("PSR") ¶ 27. He had several couriers who worked for him, driving around all day, every day, delivering methamphetamine and heroin to customers who ordered anything from a few grams to a few ounces. Id. Reyna Ceron had two suppliers: Cristino Vargas

Mondragon, and CAMACHO (who also goes by Leobardo Mondragon, see Pre-Sentence Report ("PSR") at 3, and who is related to Vargas Mondragon). Id. ¶ 38. Vargas Mondragon was Reyna Ceron's primary supplier until August 2015, when police arrested him and seized approximately 50 pounds of heroin and 25 pounds of meth from his house. After that, CAMACHO began supplying Reyna Ceron with methamphetamine. Agents intercepted several calls between Reyna Ceron and CAMACHO related to CAMACHO's deliveries. PSR ¶¶ 46-47. On December 10, 2015, agents raided CAMACHO's residence and seized approximately 10 pounds of methamphetamine from the crawlspace under the house. PSR ¶ 49. On March 30, 2017, he pleaded guilty, admitting both that he participated in the conspiracy and that he possessed with intent to distribute the drugs found under his house.

On April 24, 2018, the Court sentenced him to 121 months in prison, followed by five years of supervised release. The Court advised CAMACHO at the time of his plea and at sentencing that he likely would be deported following his release from prison. CAMACHO was deported from the United States at least once before (in 2010), and returned illegally. PSR ¶ 88.

CAMACHO is currently housed at Correctional Institution McRae in McRae, Georgia. He has served approximately 58 months of his 121-month sentence and is due to be released on July 13, 2024. Decl. of Frank Riebli Ex. A at 3. There is an ICE detainer in place, so if released, he would go directly into the custody of Immigration and Customs Enforcement, to be deported to Mexico. Id. ¶ 4. Once in ICE custody, he may seek release on bond. Id.

CAMACHO is now 37 years old. At the time Probation prepared the PSR, he was 5'5" and weighed 207 pounds. PSR ¶ 91. With that height and weight, his Body Mass Index was 34.4, putting him the "obese" weight category. See https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/English_bmi_calculator/bmi_calculator.html (last visited Oct. 8, 2020). The PSR noted that he was taking medication to control his blood pressure, and that he had previously experienced asthma and bronchitis, but that he had stopped receiving treatment for it 15 years earlier. PSR ¶ 93. CAMACHO's medical records from his current period of incarceration indicate that he is still obese. As of July 21, 2010, he weighed 218 pounds, which results in a BMI of 36.3. Riebli Decl. Ex. B at 5. In July 2020, CAMACHO said he had not been taking his blood pressure medication for about four months and asked to stop the prescription. Id. at 17. His doctor agreed because he had uncomplicated hypertension that

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY     2

was stable and well under control. Id. at 15-17. His medical records indicate no other ailments or conditions relevant to this motion – it appears he has never complained of or been treated for asthma or bronchitis. Id. ¶ 3. Moreover, his lab results indicate that, except for elevated cholesterol, he is otherwise healthy. Id. at 8-11.

On August 6, 2020, CAMACHO's counsel wrote a letter to the Warden at CI McRae and asked that the institution consider CAMACHO for a reduction in sentence. See Dkt 782-1 at 2. On August 24, 2020, the Warden responded, denying CAMACHO's request. See Dkt 782-2 at 2. CAMACHO filed his present motion on September 29, 2020. Dkt 782.

### III. DISCUSSION

The government agrees that CAMACHO has exhausted his administrative remedies and/or waited more than 30 days after submitting his request to his institution's warden before filing this motion. Accordingly, the Court may consider the merits of his claim.

#### A. CAMACHO's Obesity Puts Him at Greater Risk from COVID-19.

The Court may only reduce an offender's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court finds (as relevant here) that "extraordinary and compelling reasons warrant such a reduction," and that a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); United States v. Reid, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020); United States v. Robinson, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020). The applicable policy statement, found in the Sentencing Guidelines § 1B1.13, requires a determination that the defendant is not a danger to the community. Cf. United States v. Cazarez, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020) (denying compassionate release claim due to danger). The Sentencing Commission also provided explicit examples of what type of condition might constitute "extraordinary and compelling circumstances," including a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care" while in prison. U.S.S.G. § 1B1.13 cmt. n.1. It is CAMACHO's burden to show the "extraordinary and compelling circumstance" that warrants early release. See United States v. Shabudin, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020);

United States v. Greenhut, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (citing United States v. Sprague, 135 F.3d 1301, 1306-07 (9th Cir. 1998)).

CAMACHO's medical records indicate that he is obese and may suffer from hypertension. The CDC has stated that obesity puts a person at risk of severe illness if the person contacts COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 8, 2020). CAMACHO's medical records indicate that his BMI has been above 30 since at least July 2018, and thus that he is obese. This is a risk factor.

The CDC has also stated that persons with pulmonary hypertension might be at higher risk.[1] Id. CAMACHO has been treated for hypertension in the past, though he asked to be taken off his blood pressure medication in July and his condition appears to be borderline. The CDC does not offer a definitive statement on what blood pressure numbers constitute hypertension. See https://www.cdc.gov/bloodpressure/about.htm ("The guidelines used to diagnose high blood pressure may differ from health care professional to health care professional.") (last visited Oct. 9, 2020). According to one standard, a person has hypertension if his blood pressure is consistently 130/80 mm Hg or higher. Id. According to another, hypertension is blood pressure consistently above 140/90 mm Hg. Id. CAMACHO's medical records indicate that his blood pressure was 133/81 in July 2020 without medication, and 117/71 in January 2020 with medication. Riebli Decl. Ex. B at 7. The government agrees that CAMACHO's obesity puts him in a high-risk category,[2] and that this, plus the existence of the coronavirus pandemic, constitutes an extraordinary and compelling circumstance under § 3582(c)(1)(A).

///

---

[1] It is now unclear whether this risk factor is attributed solely to pulmonary hypertension, which is not among CAMACHO's diagnoses, or also essential hypertension, which is. For purposes of this opposition, the government will assume that CAMACHO's hypertension might be a risk factor.

[2] Obesity is a mutable characteristic and is, to some degree, the product of personal choices. For example, CAMACHO's doctors have been advising him for years to eat a healthy diet and exercise regularly. Yet for some period of time, he was electing not to go out on the yard and exercise. In some cases, the government has argued that a BMI near 30, combined with the risk of contracting COVID-19, does not put an inmate in a high-risk category because it is clear that he is choosing to remain obese. In this case, CAMACHO would need to lose about 28 pounds to bring his BMI below 30. Because that would be difficult to do and take time, even with the best intentions and discipline, that government agrees in this case that CAMACHO's BMI puts him in a high-risk category.

**B.     Section 3553(a) Factors Weigh Against CAMACHO's Release.**

That does not automatically mean that the Court should grant his motion, however. The Court also must consider whether the factors set forth in 18 U.S.C. § 3553(a) favor CAMACHO's release, and whether he poses a danger to the community if released. 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13. Those factors do not support release. To begin, other courts have denied motions for early release from high-risk inmates, particularly when they had significant time left on their original sentences, as CAMACHO does. See, e.g., United States v. Ramirez, 2020 WL 5576744, at *4 (D. Ariz. Sept. 17, 2020) (denying release from FCI Safford for an obese defendant with hypertension who had served 110 months of a 240-month sentence for drug trafficking, finding that his medical conditions failed to establish an extraordinary and compelling circumstance); United States v. Votaw, 2020 WL 3868468, at *2 (E.D. Cal. Jul. 9, 2020) (denying release for an obese defendant who had served 5 months of a 24-month sentence, finding that his obesity did not constitute an extraordinary and compelling circumstance in part because there was only one case of COVID at his facility); United States v. Brown, 2020 WL 3833284, at *4-5 (D. Md. Jul. 8, 2020) (denying release for an obese inmate with hypertension and asthma, where there were few COVID cases at his facility, finding he did not demonstrate extraordinary and compelling circumstances); United States v. Rivera, 2020 WL 3547938, at *5 (D. Haw. Jun. 30, 2020) (denying release for an obese defendant with hypertension and asthma who had served two and a half years of a 115-month sentence in a wire fraud case, even though defendant had no prior convictions and no disciplinary issues and there were COVID cases at the adjacent facility).

CAMACHO wants the Court to assume the Court has only two choices: deny the motion and thereby ensure that he contracts COVID-19 and dies; or, grant the motion and prevent him from becoming infected. But of course that's a false choice. COVID-19 is raging in every community across the country, including Sonoma County, where CAMACHO was living prior to his arrest, and in Mexico, where he will go if he is deported. The prison where he resides currently has zero inmate cases. See https://www.bop.gov/coronavirus/ (last visited Oct. 9, 2020).[3] Since March, that facility has had one

---

[3] Because CI McRae is a privately-managed facility, it is necessary to go to the section titled "COVID-19 Cases" and click on the link for "Full breakdown and additional details …" and then click on the hyperlink for "privately managed prisons," to find the data. It is true that the number of cases changes over time, and were this April or May, zero current cases and only 20 total cases might just be

inmate death and 20 inmate cases. Id. According to Johns Hopkins University, Mexico has had 804,488 cases and 83,096 deaths, including 22,196 cases and 1,768 deaths in Michoacán, where CAMACHO proposes to go if he is released and remains in Mexico. See https://coronavirus.jhu.edu/map.html (last visited Oct. 9, 2020). The Court does not have the ability to deliver him from a place where COVID-19 is a threat to a place where it is not. Indeed, based on the current data, releasing CAMACHO would have the opposite effect. Cf. United States v. Lazarte, 2020 WL 3791977, at *4-5 (D. Md. Jul. 7, 2020) (denying release for an inmate with morbid obesity and hypertension where there were no COVID cases at his facility, finding that this undermined a showing of particularized risk); United States v. Cooper, 2020 WL 2773478, at *1 (D. Nev. May 28, 2020) (denying release for inmate at FCI Safford because that facility had zero cases, whereas Nevada – where he wished to reside – had over 8,000 positive cases). Further, CAMACHO has not even attempted to show that CI McRae is incapable of providing him adequate medical care if he contracts COVID-19. His medical records – which show attention for both chronic conditions (obesity and possible hypertension) and acute conditions (an injured elbow) – would undermine any such attempt. And though CAMACHO is in a high-risk category, it is also true that the vast majority of cases of COVID-19 are mild to moderate. Even if he contracts the illness, there is no way to know now that he will experience more severe symptoms. And there is every indication that his institution would be able to treat him if he does contract COVID-19.

The circumstances of CAMACHO's current incarceration thus do not suggest a particularized risk as to him.

The other § 3553(a) factors also weigh against reducing CAMACHO's sentence. First, he committed a serious offense. He trafficked in large quantities of a dangerous and destructive drug. Though drug trafficking may not fit the legal definition of a "violent offense," it would be a mistake to infer that his conduct is somehow less harmful. He contributed to the ruin of others' health and lives, and to the despair of all those who cared about the persons who bought his drugs. Both the wire

---

good luck. But such low numbers after six months tends to indicate that the institution has put in place effective measures to protect the inmates. Some courts have considered the conditions at the inmate's institution as part of the threshold analysis whether there were extraordinary and compelling circumstances warranting release.

intercepts and the quantity of drugs agents seized from CAMACHO's house indicate that he was at least a mid-level distributor, meaning that he was responsible for more misery than the street dealers who sold his meth in face-to-face transactions. Reducing his sentence from 121 months to approximately 58 months results in a sentence that fails to reflect the seriousness of his offense.[4]

It also creates an unwarranted sentencing disparity vis-à-vis CAMACHO's co-defendants. CAMACHO's sentence already was the lowest of the defendants at his level of the conspiracy. Eutimio Reyna Ceron and Cristino Vargas Mondragon each received 168 months. Rodolfo Rivera Herrera received 145 months, and Marcelino Reyna Ceron received 127 months. CAMACHO was a supplier, like his nephew Vargas Mondragon, and thus should receive one of the longer sentences in this case. A 121-month sentence made sense because he was involved only for about four months. But he is still significantly more culpable than the couriers, who received between 44 and 52 months, and more culpable the Raymundo Doval Duran, another retail distributor who received 96 months. Reducing CAMACHO's sentence to 58 months would treat him as though he were only slightly more culpable than the couriers and less culpable than one of the retail distributors. That would result in an unwarranted sentencing disparity.

Third, deportation does not mitigate the danger he presents to our community because of the direct line between Zicuiran, Michoacán, Mexico, where CAMACHO is from, and the Bay Area, where he and others were selling drugs. As the Court will recall, the network that sucked money and vitality from the community in Santa Rosa was based on family and social ties in Zicuiran and the surrounding villages. CAMACHO's family (including his nephew, Cristino Vargas Mondragon), were an important part of that network – they supplied enormous quantities of methamphetamine and heroin to the Bay Area. Indeed, CAMACHO most likely became a mid-level distributor after Cristino's arrest because of his family connections, the same family connections he will have when he gets out of prison and returns

---

[4] CAMACHO suggests that he was primarily an addict who stored drugs for others in exchange for small sums of money he put towards his bills. Mot. at 15-16. He did much more than store drugs for others. As the PSR describes, he actively distributed drugs – agents monitoring Reyna Ceron's communications intercepted calls in which CAMACHO negotiated meth deals with Reyna Ceron, and then saw CAMACHO deliver the drugs to Reyna Ceron. He may also have had a drug problem, but he was not a low-level user/dealer by any description.

to Zicuiran. CAMACHO thus will have the means and the external pressures to rejoin a drug trade that directly harms the Bay Area.

Courts often doubt whether longer sentences provide greater deterrence to others who might consider entering the drug trade, and in some cases that doubt may be well-founded. But not here. It is precisely because of the way the network was structured that we can expect CAMACHO's and his co-defendants' sentences to have deterred others. The people most likely to join this network are the people who are most likely to have learned about the serious consequences of getting caught. The people willing to come north to ply the drug trade presumably were doing so because of the promise of greater income than they could make in Mexico – and the example of people like Camacho, Reyna Ceron, and others, who were doing just that. Those same people now see that the ones who went before them have lost their liberty and are not making any money for long periods of time. They are not improving their own fortunes or the circumstances of their families in Mexico. That is a powerful disincentive to join the drug trade. The money and effort it takes to travel north from Zicuiran, cross the border into the United States, and then make it to Santa Rosa look like a bad investment if there is the very real possibility of that trip ending in a lengthy stay in an American prison cell.

For the same reason, cutting CAMACHO's sentence in half will change the risk/benefit calculation and perhaps make the trip perhaps more worth the risk.

The § 3553(a) factors thus do not support release.

The cases CAMACHO cites do not change this conclusion. In United States v. Hernandez, 451 F. Supp. 3d 301, 301-02 (S.D.N.Y. 2020), for example, the inmate had been sentenced to 24 months in prison and had just four months remaining on his sentence. He had asthma and was confined in New York in April – the epicenter of the first wave of the pandemic in the United States. Id. The Court found that he no longer posed a danger to the community and the government supported his request for release. Id. at 305. In other words, the inmate there had almost completed his sentence, posed no danger to the community, and faced significant risks – both because of his health and the prevalence of COVID-19 in the community at that point. Release in those circumstances was appropriate.

Similarly, in United States v. Robinson, 2020 WL 1982872, at *1 (N.D. Cal. Apr. 27, 2020), the inmate had four months remaining on a 15-month prison term for mail fraud. He was housed at FCI

Lompoc, which was then "battling one of the most serious COVID-19 outbreaks in the nation," and was taking immunosuppressing medications, which put him at heightened risk of serious illness if he contracted COVID-19. Id. In those circumstances, the risks to the inmate were extraordinary and the risk to the public nominal. Id. at *3. Once again, the government did not oppose his request, and the Court ordered his release. Id.

The inmate in United States v. Sarpong, 2020 WL 5578420, at *1 (S.D.N.Y. Sept. 17, 2020), had Type II diabetes, obesity and kidney disease. He had served 221 months of a 235-month prison term, and was already subject to a final order of removal to Ghana. Id. at *2. In light of his certain and imminent removal from the United States, plus the difficulties of returning to the United States from Ghana and the length of time he already had served, the court found that reducing his sentence to time served (235 months) was consistent with 18 U.S.C. § 3553(a)'s goals, and did not pose a danger to the community. Id. at *3. Accordingly, it ordered him released.

The inmate in United States v. Olawoye, 2020 WL 4559816, at *2 (D. Or. Aug. 7, 2020), also had Type II diabetes, obesity, and hypertension (and other conditions) that placed him at higher risk of serious illness from COVID-19. And he was then at an institution "which has seen exponential growth in positive COVID-19 tests in recent weeks." Id. He had served about 67% of a 108-month prison term for fraud and identity theft, and was to be deported back to Nigeria upon his release. Id. at *5. On those facts, the court found that there were extraordinary and compelling circumstances warranting his release, and that releasing him about 30 months early did not unreasonably cheapen his offense, and that he was unlikely to pose a threat to the community because he had no criminal history and was being deported.

Just to state the facts of the cases CAMACHO cites is to demonstrate that they do not support granting his motion here. First, the inmates in Hernandez and Robinson were only a few short months away from completing their sentences anyway. Release at that point did not have the same tendency to result in a sentence that failed to account for the seriousness of the offense. CAMACHO, on the other hand, is just about halfway through a lengthy sentence and still has almost four years left to serve. Second, CAMACHO's sentence was much longer than the sentences in Hernandez, Robinson, and Olawoye. This too is significant because it indicates the relative seriousness of his offense compared to theirs, and the risks of undervaluing the offense by shortening his sentence to time served.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY                9

Second, CAMACHO is obese, but he is in a facility that has had a low number of COVID-19 infections and which currently has none. This suggests that the facility's efforts to protect the inmates are working, and indicates that there is none of the urgency here that there was in Hernandez, Robinson, and Olawoye. In those cases, the institutions (or in Hernandez, the community around the institution) were in the midst of significant outbreaks. The courts in those cases reasonably could believe both that they were protecting the individual inmates whose cases they were adjudicating and the inmates who remained, by reducing their numbers. Thankfully, that factor is not present in this case.

Finally, though the courts in Sarpong and Olawoye found the fact of deportation significant, the possibility of deportation here does not have the same weight for two reasons. First, there was a final order of removal in Sarpong; there is no such order here, which means that CAMACHO's removal, though likely, is not certain. And in Olawoye, the inmate's immigration hold had prevented him from participating in drug counseling and educational programming that the court expressly had recommended. That is not the case here; CAMACHO attached to his motion the certificates showing that he had participated in drug counseling and vocational education courses. Second, the inmates in Sarpong and Olawoye were being deported to countries on another continent that shared no land border with the United States. The odds that they would be able to return any time soon were negligible. If deported, CAMACHO will be returned to Mexico, which does share a land border with the United States. CAMACHO's own record demonstrates that he can and will cross that border to enter the United States illegally if he desires. Indeed, his wife remains in Santa Rosa. He will have every incentive to return, and this in turn implicates all of the community safety concerns discussed above.

## IV.  CONCLUSION

For the foregoing reasons, the government asks that the Court deny CAMACHO's motion.

DATED: October 9, 2020            Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
FRANK J. RIEBLI
Assistant United States Attorney

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY          10