JOHN J. JORDAN, ESQ.  (State Bar No. 175678)
601 Montgomery Street, Suite 850
San Francisco, CA   94111
(415) 391-4814
(415) 391-4308 (FAX)
Email: jjordanesq@aol.com

Attorney for Defendant
VALENTIN CAMACHO TOLEDO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-15-0579-VC |
| Plaintiff, | |
| v. | **REPLY BRIEF RE MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. SECTION 3582(c)(1)(A)(i)** |
| VALENTIN CAMACHO TOLEDO, | |
| Defendant. | |
| | Hon. VINCE CHHABRIA |

**INTRODUCTION**

The defendant, VALENTIN CAMACHO TOLEDO, has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), asking the Court to reduce his 121 month sentence to time served, followed by immediate removal to Mexico, the defendant's country of origin.

The government has now filed an opposition, arguing that while the motion is properly brought, it should be denied on the merits.  The government agrees that the defendant's health condition puts him in a high-risk category, and that this, plus the existence of the coronavirus pandemic, constitutes an extraordinary and compelling circumstance under § 3582(c)(1)(A). Opp. at page 4.  However, the government argues that the factors set forth in 18 U.S.C. § 3553(a) do not favor release and he poses a danger to the community if released.

Toledo disagrees with the government's analysis.  First, the government's argument that

1   placement in a prison does not increase the risk to Toledo is wrong.  Second, the Section 3553

2   factors favor release.  Finally, deportation to Mexico minimizes any danger to this community.

3   This Court should grant the motion.

## ARGUMENT

**A.   Introduction**

Mr. Toledo now asks the Court to grant his compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), by reducing his 121 month sentence to time served, so that the defendant can be released and deported to Mexico.  The COVID-19 pandemic, Toledo's health situation, and his immigration status, all combine to constitute extraordinary and compelling reasons to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).

**B.   Toledo is at Greater Risk While Incarcerated**

To the extent that the government argues that Toledo is in no greater danger because he is in a prison, Toledo disagrees.  The government cites no authority for this proposition.  In contrast, Toledo cited to the declaration of Dr. Brie Williams in his opening memorandum, who stated in her attached declaration that "Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons."  See Exhibit D, Attached Declaration, page 3.

In addition, the government's argument goes against the position of the Attorney General, who, in his memorandum of March 26, 2020, recognized that the COVID-19 pandemic necessitated a reconsideration of who should remain incarcerated during this crisis.  The argument goes against the actions of the BOP, who also recognized the risk and placed 7,822 inmates on home confinement to date.  https://www.bop.gov/coronavirus (October 10, 2020).

Just taking a rough look at the BOP COVID-19 statistics in comparison with the U.S. statistics shows the added risk of contracting COVID-19 that an incarcerated individual faces.  As of October 10, 2020, there are a reported 7,670,419 confirmed COVID-19 cases in the United States, out of an estimated U.S. population of 329,877,505.  See https://coronavirus.jhu.edu/

Toledo Reply Re Mtn Comp. Release            2

1  (October 10, 2020); https://www.census.gov/popclock/ (October 10, 2020). If counsel's math is

2  correct, it appears that .0233 of the U.S. population at large has contracted the virus. The BOP

3  reports that as of October 10, 2020, there are 15,130 federal inmates who have ever tested

4  positive for COVID-19, out of 126,127 inmates.  https://www.bop.gov/coronavirus (October 10,

5  2020). It appears that .1199 of the BOP prison population has contracted the virus, a rate much

6  higher than the general population.

7      The government also points out that as of this moment, there are no reported cases of

8  COVID-19 at CI McRea, where the defendant is currently housed. But, as the government

9  acknowledges, there have been cases of COVID-19 at the facility. The BOP reports 20 prior

10 cases and one death.  htttps://www.bop.gov/coronavirus (October 10, 2020). The government

11 cannot guarantee that a future outbreak will not happen at the facility, no more than it could

12 prevent an outbreak at the White House.

13     As Toledo argued in his opening brief, his incarceration robs him of any realistic

14 opportunity to maintain the "social distance" that others out of prison can do. Unlike some

15 others, he wants to limit his chances of contracting the virus. But, his confinement in a prison

16 environment raises a grave risk to his health that now outweighs the government's interest in

17 incarcerating him.

18 **B.     A Review of the Mitigating Factors under  18 U.S.C. § 3553(a) Also Support the
         Reduction.**
19
20     Toledo disagrees with the government's argument that a review of the mitigating factors

21 under 18 U.S.C. § 3553(a) does not support release.

22     First, Toledo does not disagree with the government's argument that distribution of

23 methamphetamine is certainly a serious offense, that the quantity here was significant, and that

24 he was not a street-level dealer. But, it was also true that he was vulnerable to the approach of

25 the major players in this case because of his addiction problems.

26     Second, the government fails to address the defendant's argument that the purity and

amount of the methamphetamine he possessed was in the control of the principals, who asked the defendant to store the drugs for them.  The defendant faced a high guideline sentence and a 10-year mandatory minimum because of the purity of the methamphetamine that was sold.  But, Toledo pointed out in his opening memorandum that United States District Courts have recently rejected the 10:1 mixture-to-actual methamphetamine ratio based on policy disagreements with the Guidelines.  *United States v. Bean*, 371 F.Supp.3d 46, 51 (D. N.H. 2019) (citing cases); see also *United States v. Nawanna,* 321 F.Supp.3d 943, 955 (N.D. Iowa 2018).  The government simply fails to address this point in its opposition.

Third, as to the government's disparity point, the original sentence of the defendant was roughly comparable to other co-defendants.  However, this is a motion for compassionate release based on the changed circumstances of the defendant's health conditions and the impact of the COVID-19 pandemic.  Comparison to sentences imposed before the virus started burning through the country ignores this unfortunate change of circumstances.

Fourth, Toledo disagrees with the government's argument that granting the motion sends the wrong message to others. Toledo, who was remanded into pre-trial custody on this case on December 10, 2015 and stayed in custody through sentencing (PSR page 2), has now served approximately 57 months in prison, the equivalent of a 5 year sentence minus good time. Counsel submits that this is adequate punishment and sufficiently warns others.

Finally, as the defendant will be deported, his release will in no way endanger the American public.  While the government argues that Toledo can simply re-enter this country after deportation and rejoin his family, the argument ignores the reality that doing so would subject Toledo to a Form 12 violation with a new prison term; a Section 1326 immigration charge that would subject him to a probable consecutive prison term; and removal again to Mexico.  Further, it would be unrealistic for Toledo to think he could move back with his family here in the Northern District and not be noticed by the very agents who arrested and prosecuted him in this case.

### C. Toledo's Deportation Is Another Factor Supporting Granting the Motion

The government's rejection of Toledo's argument that paying to house him in a private prison, when he is willing to accept immediate deportation after already serving a significant portion of his sentence, makes little sense. As argued in Toledo's opening brief, other federal district courts have recognized that the certainty of deportation can be a factor considered in deciding a motion for compassionate release. See, e.g., *United States v. Sarpong*, 2020 U.S. Dist. LEXIS 170559 (S.D. New York September 17, 2020). The Attorney General and the BOP have recognized the need to release to home detention those that do not need to be in prison, in light of the COVID-19 pandemic. Toledo is not eligible for release to home detention. But he is eligible for removal to Mexico.

The government appears to argue that Toledo's deportation is not certain. But, Toledo remains willing to stipulate to his deportation as a condition of the granting of this motion. The PSR notes that he already has a prior deportation and two serious drug convictions (PSR sentencing recommendation, page 3), leaving little doubt as to his deportation once released from Federal prison. He is willing to sign appropriate forms asking for immediate deportation.

Toledo would not be a danger to this community if he was released and deported, and he has a viable release plan to return to his family in Mexico. He has submitted proposed release language to the Court. CR 785.

Thus, the combination of defendant's health status, immigration status, and the COVID-19 pandemic, all support granting the motion.

## CONCLUSION

The defendant asks this Court to reduce his sentence to 57 months, or time served, followed by 5 years supervised release, with a condition that he consent to immediate removal to

//

//

//

Mexico, his country of origin, upon release from the BOP on this case.

DATED: October 10, 2020.   Respectfully submitted,

                                 */s/ John J. Jordan*
                                 JOHN J. JORDAN