DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    frank.riebli@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-579 VC |
| Plaintiff, | |
| v. | GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO MOTION FOR REDUCTION IN SENTENCE |
| VALENTIN CAMACHO TOLEDO, | |
| Defendant. | Date:   Nov. 3, 2020<br>Time:   11:00 a.m. |

In its October 23, 2020 order (Dkt #790), the Court set the above-captioned matter for hearing on November 3, 2020 to determine the likelihood that CAMACHO Toledo will be deported, whether his family intends to join him in Mexico, and whether there is a risk that he will return to the United States after he is deported. The Court permitted the parties to submit additional filings in advance of the hearing. The government thus submits this supplemental opposition to address those topics.

**1.    Camacho Toledo Likely Will be Deported**

Based on communications with employees from Immigration and Customs Enforcement ("ICE"), including the Assistant Chief Counsel in San Francisco, the government's understanding is that CAMACHO likely will be deported following his release from custody in this case. If he agrees to removal and ICE reinstates a prior removal order, then he could be deported within a few days following

his release, provided that he enters the stipulations described in his supplemental brief.  See Dkt #792 at 2:21-26.  If he does not do as he describes in that brief – for example, if he were to raise a claim under the Convention Against Torture – then he would remain in custody until his immigration proceedings conclude, which could take several months.  He could seek bail after six months in custody.

If he is released to ICE custody in Georgia, then he likely will be returned to Mexico through a Port of Entry in Texas.

**2.  The Likelihood that Camacho Toledo's Family Will Join Him in Mexico.**

The government has no information on this issue beyond what is in CAMACHO's filing.  The significance of the information CAMACHO presented is discussed below.

**3.  The Likelihood that Camacho Toledo Will Return to the United States.**

The same day the Court issued its Order, the government requested CAMACO's A-file from ICE.  That file is currently in Georgia and efforts to get it to California in time for this filing – or to have it scanned and emailed in pdf form – have been unsuccessful.  Nonetheless, the government obtained the following information.  CAMACHO has been denied admission or removed from the United States at least five times.

- The first removal appears to have been on September 11, 2003.  CAMACHO was apprehended at the Calexico Port of Entry ("POE").  He provided the name "Leonardo Madrogon-Carillo" and a different date of birth on that occasion.  The Court will recall that one of his aliases, and the way he was known during the investigation in this case, was as Leobardo Carillo-Mondragon.  He accepted voluntary return.  Government counsel was not able to obtain any further information about this incident.
- The second removal appears to have been on or about March 16, 2010, following an arrest in Sonoma County for providing false identification to a police officer.  His criminal history, in the Pre-Sentence Report ("PSR") at ¶¶ 68-72, indicates he had been in the country for at least five years at that point, indicating that he had entered the United States shortly after his 2003 removal.  During the arrest in Sonoma County that led to his eventual removal, he gave the name Leobardo Carillo Mondragon.  Id. ¶ 72.  ICE identified him as Valentin Camacho Toledo.  Once again, CAMACHO accepted

      voluntary return to Mexico.

- The third removal happened four months later, on July 12, 2010, following another arrest in Sonoma County, this time for possession of methamphetamine.  See PSR ¶ 73.  His co-defendant in this case, Jose Ricardo Chavez Yanez, and his wife and daughter were in the car with him at the time of that arrest.  Id.  CAMACHO accepted a voluntary return to Mexico and was deported through the Calexico POE in the late afternoon.

- The fourth removal happened four days later, on July 16, 2010.  CAMACHO had attempted to enter the United States by hiding in the trunk of a car and then passing through the San Ysidro POE close to midnight on July 15, 2010.  The San Ysidro POE is over 150 miles from the Calexico POE.

- The fifth removal happened less than a month later, on August 5, 2010, at the Calexico POE.  CAMACHO had attempted to enter the United States the previous afternoon using false identification documents.  He claimed to be Luis Fernando Lopez Moreno.  The Border Patrol officer reviewing his application doubted the veracity of his claim and referred him to secondary inspection, where he stated that he had purchased the identification documents from an unknown vendor in Mexico for $3,000.  He admitted that his intent was to return to the Santa Rosa area.  He was denied entry and removed to Mexico through the Calexico POE.

CAMACHO evidently returned to the United States following that fifth removal, because he was intercepted talking to co-defendant Eutimio Reyna Ceron in November 2015, and was arrested on December 10, 2015, with approximately 10 pounds of methamphetamine hidden in the crawl space under his house.

      CAMACHO's record indicates a strong desire to remain in the United States, and the resources to return as many times as he is deported.  Indeed, the fact that he was able to make his way from Calexico to San Ysidro and then end up in the trunk of a car coming across the border at San Ysidro in just over 72 hours indicates that he has the support and the resources to return if he wishes.

      CAMACHO asserts that he will not return to the United States because he would face prosecution for the illegal re-entry, under 8 U.S.C. § 1326.  He faced prosecution under § 1326 each of

the five times he returned or attempted to return in 2010.  The maximum penalties will be steeper next time – 20 years, as opposed to two years, compare 8 U.S.C. § 1326(b)(2) with id. § 1326(a) – but the fact that he faces prosecution for re-entering the country illegally is not new and it has never deterred him before.

CAMACHO presumably would say that at least five of the last six times he entered the United States, it was to return to his family, and that they are now promising to go to Mexico.  So he no longer will have the motivation to return to the United States.  The government has no information about his family's plans beyond what is in his supplemental memorandum.  But it is significant that a move like that would require uprooting his 11 and 8 year-old daughters in the middle of a school year and moving them to a country they've never known.  That is not so easily done.  Perhaps that is why they have not moved yet, even though they have known for the past five years that he was going to be deported after his release from prison.  Indeed, moving to Mexico would have been much easier for his family three years ago (when he was sentenced), when the kids were younger and could have adapted more quickly (both socially and linguistically), but they stayed.  Moving in 2010 would have been easier still.  But they did not, presumably because they found greater economic opportunity and a more stable, less violent society than the one that awaited them in Michoacán if they return.  All of the factors that led them to stay before will make it that much harder to leave now.

CAMACHO also asserts that they would be glad to leave now because life in the United States has become harder since the COVID-19 pandemic struck.  Dkt. 792 at 4:12-13.  The pandemic has made life in Mexico harder too.  Further, the public health restrictions, job losses, wage cuts, and economic recession have been a fact for over seven months.  Yet as of the filing of his supplemental memorandum, they have not departed for Mexico, even though they have known that CAMACHO was going to be deported upon his release from prison.  If nothing else, the fact that they haven't yet moved to Mexico is an indication of how difficult such a move would be.  CAMACHO's supplemental memorandum notes that he has a house in Michoacán, and that his family has lime orchards and a permit to slaughter animals.  Dkt #792 at 4:4-7.  If that occupation was enough to sustain him and his family before, then he could have moved his family back to Michoacán years ago and avoided the risks – jail, exploitation by unscrupulous employers, among other things – of living in the United States without legal status.  But he

did not. And sadly, none of the reasons he chose the United States over Mexico have changed in the past decade. Even COVID-19, which has made life harder for his family and everyone else in the United States, has afflicted Mexico and Michoacán.

    For all of these reasons, the government considers it likely he will return to the United States after he is removed.

    The government continues to oppose CAMACHO's request for a reduction in his sentence and asks that the Court deny it.

DATED:  October 30, 2020                          Respectfully submitted,

                                                                           DAVID L. ANDERSON
                                                                           United States Attorney

                                                                           _____/s/_____
                                                                           FRANK J. RIEBLI
                                                                           Assistant United States Attorney